MARK ROSENBUSH
Attorney at Law (CSB 72436)
214 Duboce Avenue
San Francisco, California 94103
Tel: (415) 861-3555
Fax: (415) 255-8631

Attorney for Defendant
ARTACHES TER MKRTICHYAN

THOMAS V. JOHNSTON
Attorney at Law (CSB 82019)
15915 Ventura Blvd., Suite 301
Encino, California, 91436
Tel: (818) 905-5454
Fax: (818) 986-1330

Attorney for Defendant
SERGE ZADIKIAN

HARLAND BRAUN
Attorney at Law (CSB 41842)
1880 Century Park East, Suite 710
Los Angeles, California, 90067
Tel: (310) 277-4777
Fax: (310) 277-4045

Attorney for Defendant
SARKIS MADJARIAN

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>　　Plaintiff,<br><br>vs.<br><br>ARTACHES TER MKRTICHYAN,<br>SERGE ZADIKIAN, and<br>SARKIS MADJARIAN<br><br>　　Defendants. | No. CR-08-0307 MMC<br><br>**DEFENDANTS' REPLY<br>RE POST-HEARING BRIEFING**<br><br><br><br><br><br>Court: Hon. Maxine M. Chesney |

　　Defendants' Ter Mkrtichyan, Zadikian and Madjarian jointly submit the following post-hearing reply memorandum in support of their motion to suppress.

　　The government maintains that officer Hubbard's search of the car with the dog "Jino" took

*Ter Mkrtichyan: Post-Hearing Reply*

place prior to the return of the EPIC check, which was no more than 15 minutes after Hubbard initially stopped defendants' vehicle. See United States Post-Hearing Opposition at 8:8-17; see also RT 5/14 at 139:11-24; Defense Exhibit B. However, the CAD record, as well as the testimony of Mr. Madjarian and the former CHP officers, plainly indicates the police searched the car long after the routine records checks on the vehicle and Mr. Grimyan's license were completed.

## ARGUMENT

I. THE DETENTION OF DEFENDANTS WENT FAR BEYOND THE SCOPE OF A PERMISSIBLE TRAFFIC STOP FOR A SPEEDING VIOLATION.

A. <u>The Applicable Law</u>.

For the most part, the defense and the government agree as to the law applicable to the Court's analysis of whether the traffic stop of defendant's was unreasonably prolonged. In sum, the scope and length of the detention must not exceed what is reasonable necessary to effectuate the purpose of the stop, in this case to investigate a traffic ticket. See, e.g., *Illinois v. Caballes*, 543 U.S. 405, 407 (2005); *United States v. Mendez*, 476 F.3d 1077, 1080 (9th Cir.), cert. denied, 127 S. Ct. 2277 (2007); see also United States Post-Hearing Opposition at 5:12-13.

However, in its post-hearing brief the government cites the *Mondello* decision for the proposition that a thirty-minute detention for the purpose of conducting a canine sniff search was permissible so long as the agents "'worked as quickly as possible' under the circumstances. United States Post-Hearing Opposition at 5:18-20 (citing *United States v. Mondello*, 972 F.2d 1463, 1471 (9th Cir. 1991). To the extent the government 's argument suggests that a substantial period of detention prior to a dog sniff search is reasonable whenever the agents "diligently" continue to advance their investigation, the government's citation to *Mondello* is somewhat misleading. In fact, the circumstances underlying the diligent investigations at issue in *Mondello* as quite different than in the instant case.

*Ter Mkrtichyan: Post-Hearing Reply* - 2 -

In *Mondello,* unlike in this case, the police had reasonable suspicion that defendant Mondello was committing a crime involving large scale narcotics trafficking, not a mere speeding violation. Defendant Mondello was detained and his luggage subjected to a canine sniff search at the San Diego Airport, as Mondello was boarding a charter flight. Mondello, 972 F.2d at 1465. Prior to detaining Mondello and conducting the canine search, the law enforcement officers were aware that

> (1) Mondello had been chartering flights for the past six months, paying $12,000 in cash each time; (2) The flights were one-way, either to Boston or to Ft. Lauderdale, a known drug haven; (3) The flights were late at night; (4) There was no 'lead time' before the departures (i.e., Mondello booked the flights on the day he was to leave); (5) Mondello told the charter company he was a musician, yet he never carried an instrument on the plane; (6) A trained police dog had previously 'alerted' in the presence of money Mondello had given the charter pilot.

*Id.* at 1470-71. The Ninth Circuit found '[t]hese facts strongly suggested Mondello was trafficking narcotics. We hold there was a reasonable suspicion a crime was afoot." *Id.* at 1471. The investigation the police conducted "as quickly as possible" in *Mondello* was thus an investigation of a possible major narcotics trafficking offense, not speeding ticket. The Ninth Circuit's holding that a fairly lengthy detention preceding a canine search was justified in the course of the investigation of Mr. Mondello is therefore irrelevant in this matter, and the *Mondello* decision clearly does not stand for the proposition that the stop in this case was lawful so long as the agents worked diligently on a narcotics investigation.

      B.    <u>The Evidence at the Hearing Clearly Established an EPIC Check Is Not Part of a Typical Speeding Enforcement Stop.</u>

Without citation to any testimony or other evidence, the prosecution asserts officer Hubbard "could have been" an officer who was authorized to run EPIC checks. See United States Post-Hearing Opposition at 9:8-12. However, the evidence clearly indicates officer

*Ter Mkrtichyan: Post-Hearing Reply*      - 3 -

1  Hubbard was not in fact authorized to routinely run EPIC checks. See RT 6/2 at 57:19-22; RT
2  5/14 at 115:19 - 116:7; RT 6/3 at 21:2 - 22:3; see also Defense Exhibit C.
3
4        Defendants do not dispute that this traffic stop was typical in scope and duration in officer
5  Hubbard's experience. However, officer Hubbard, who worked as a canine unit conducting drug
6  interdiction, typically does not execute stops for simple speeding tickets. Officer Hubbard's
7  traffic stops routinely last an hour, as they typically involve narcotics investigations. In any
8  event, as the Court noted at the hearing, the duration of officer Hubbard's "typical" traffic stop is
9  irrelevant to the issue of whether Hubbard's detention of defendants was unduly prolonged.

    C.    <u>The Government Has Not Produced Any Trustworthy Evidence Establishing the CAD Printout Is Inaccurate.</u>

      The government essentially asks the Court to find, based on the testimony of two officers who plainly are not experts in the filed of computer assisted dispatch processing, that the California Highway Patrol CAD printouts are entirely unreliable. However, the government did not adduce any credible evidence to support its position.

      Initially, the government's argument begs the question why the California Highway Patrol, and nearly every other law enforcement agency nationwide, bothers to keep detailed CAD records if those records are not reliable. In addition, the government did not object to the Court's admission of the CAD printout into evidence (see RT 5/14 at 78:11-12), despite the fact the hearsay exception under which the Court admitted the CAD printout requires a finding of trustworthiness. See Fed. R. Evid. 803(6); *United States v. Kaiser*, 609 F.3d 556 (2d Cir. 2010).

      The government's argument that the CAD record is unreliable flies in the face of literally hundreds of opinions issued by courts across the country in which CAD printouts from various law enforcement agencies are cited as reliable evidence of a fact. See, e.g., *DiBiasi v. Starbucks Corp.*, 2009 U.S. Dist. LEXIS 43832 (E.D. Wash. 2009)("the computer assisted dispatch (CAD) printout . . . shows [officer] Edelbrock ('A612') was 'onscne' (on scene) at 4:35 p.m."); *Williams*

Ter Mkrtichyan: Post-Hearing Reply    - 4 -

*v. Padden*, 2009 U.S. Dist. LEXIS 14005, *3 (D. Minn. 2009)("Notes in the department's computer-assisted dispatch system indicated that Williams was agitated and uncooperative."); *Mathews v. United States*, 2009 U.S. Dist. LEXIS 111828, *15 (M.D. Fla. 2009)("According to the dispatch printout, Exhibit 3, the complainant stated that he could hear the female . . . say 'If you're going to go ahead and Signal 5 yourself (kill yourself), go ahead and just leave me alone.'"); *Morales v. Taveras*, 2007 U.S. Dist. LEXIS 4081, *3 (E.D. Penn. 2007) "'Neighbors from above address yelling and screaming in front of their house. Comp[lainant] states this is a constant problem and the people from the address have been warned.' See Computer Assisted Dispatch ('CAD') sheet"); *United States v. Ruffin*, 448 F. Supp. 2d 1015, 1016 (e.D. Wis. 2006)("At about 12:12, the radio and the CAD reported that several subjects with a shotgun had robbed the tavern. The report described one subject as wearing a red and black jacket and a second as wearing a blue jean suit."); *Davis et al v. King County*, 2005 U.S. Dist. LEXIS 35984, *24 (W.D. Wash. 2005)(defendant police officers and department "relying on the CAD report from the incident" to traffic stop was not unduly prolonged); *Long v. City and County of Honolulu*, 378 F. Supp. 2d 1241, 1243-44 (D. Haw. 2005))("This testimony is supported by the 'CAD' printout of contemporaneous radio transmissions, as verified by dispatcher Battease, which indicates shots fired at 04:51:33").

      Judge Patel of this district has similarly relied on a CAD printout as substantive evidence of a police officer's movements during a foot pursuit of a suspect. See *Fernandez v. City and County of San Francisco*, 1996 U.S. Dist. LEXIS 4831, *4 (N.D. Cal. 1996). In addition, another federal court recently found a CAD printout was sufficiently reliable to warrant admission as substantive evidence of witness statements recorded within in the CAD printout under Federal Rule of Evidence 803(6). See *United States v. Harper*, 2009 U.S. Dist. LEXIS 3593, *4 (W.D.N.Y. 2009)("There does not seem to be any dispute here that the CAD printout

*Ter Mkrtichyan: Post-Hearing Reply*      - 5 -

itself meets the requirements for admission as a business record .")

The California courts have repeatedly relied on CAD printouts as evidence sufficient to establish probable cause for searches and arrests under the State's so-called "Harvey-Madden rule." The Harvey-Madden rule allows for probable cause based on a reliable showing that information establishing cause was relayed to the arresting or searching officer from a another officer who was not present at the scene, and the California appellate courts often rely on CAD printouts as evidence that such information was actually relayed to the arresting officer. See, e.g., *People v. Armstrong*, 232 Cal. App. 3d 228 (Cal. Ct. App. 1991)(printout of dispatch record sufficient to establish existence of arrest warrant). California courts have also extensively relied on California Highway Patrol CAD printouts as substantive evidence of the timing of CHP officers' actions during a traffic stop and subsequent search. See, e.g., *Weaver v. California*, 63 Cal. App. 4th 188 (Cal. Ct. App. 1998)("a CHP radio dispatch went out at 3:41 p.m., about a half-hour before the PIT maneuver, that . . . police knew the driver of the stolen Altima to be 'Jessie Keith,' a male juvenile Hispanic, 13 years old, and that the Altima was 'cold plated' meaning that the license plate had been switched so that if the police ran the number, it would not come back stolen. A dispatch at 3:42 p.m. stated that Keith was washing his neighbor's car and she gave him the keys; Keith took the car; he was not known to carry a weapon."); *People v. Granish*, 41 Cal. App. 4th 1117, 1122 (Cal. Ct. App. 1996) ("Police dispatch records showed that the report of the stolen Toyota was received at 6:12:59 p.m. and the traffic collision was reported at 6:15:46 p.m., less than three minutes later.")

Against the state and federal courts' frequent reliance on CAD records as trustworthy evidence, the government offers the opinions of Mr. Hubbard and Mr. Gantt that the CAD records are wholly unreliable.

Astoundingly, the government relies on the absence of the actual CAD recording in

*Ter Mkrtichyan: Post-Hearing Reply*        - 6 -

support of its argument that the CAD printout is largely unreliable. See United States Post-Hearing Opposition at 10:8-9. The government has the burden to establish the warrantless search at issue here was reasonable and lawful; if the government thought it had better evidence than the supposedly faulty CAD printout, the government should have preserved that evidence. More importantly, it was the government's 14 month delay (undoubtedly due to the pendency of the wiretap investigation of David Aguilera) between the traffic stop and the filing of charges in this case that caused the loss of the CAD recordings.

As to officer Hubbard's testimony concerning the supposed unreliability of the CAD record, it must be noted that officer Hubbard testified that he had only seen CAD printouts "a few times, but not that many" in his 20 year career as a CHP officer. See RT 5/14 at 79:4-7 In fact, the government asserts Hubbard "could not competently interpret the [CAD] report." See United States Post-Hearing Opposition at 9 fn. 2. Thus, according to the testimony and argument presented by the government, officer Hubbard's opinion as to the reliability of CAD entries is largely without basis, and should not be relied upon by the Court.

Officer Gantt, unlike officer Hubbard, asserted he had reviewed thousands of CAD printouts. See RT 6/3 at 87:8-16. However, officer Gantt also admitted he was not familiar with the "practices" of the operators in the dispatch center. See RT 6/3 at 73:15-19. Officer Gantt also did not understand the meaning of various entries in the CAD printout. See RT 6/3 at 102:4-7; 107:1-5; 122:5-10. Officer Gantt's opinions concerning the reliability of CAD data entries must therefore be weighed in light of his lack of familiarity the manner in which CAD records are created.

The most meaningful evidence as to the reliability of the CAD data is plainly the testimony of Rhonda Page, the CHP dispatcher. Ms. Page testified that CHP dispatchers make CAD entries contemporaneously with radio traffic. See RT 6/3 at 119:5 - 120:13. Ms. Page

*Ter Mkrtichyan: Post-Hearing Reply*            - 7 -

further testified that while some information that is conveyed through radio broadcasts might be left out of a CAD printout, such omissions do not happen "regularly."  RT 6/3 at 171:2-16.  Ms. Page stated the CAD journal typically records all information transmitted over CHP radio.  See RT 6/3 at 176:13 - 177:3; 183:23 - 184:14; 193:21 - 194:2.

In the end, the government's argument that the dog sniff of the car took place within 15 minutes of the initial stop, and prior to the dispatcher's return of the EPIC records check, asks the Court to find that officers Hubbard and Gantt made several calls for backup - extremely important events for officer safety - but that the dispatcher did not bother to enter these calls into the CAD system.  The government also asks the Court find not only that the call for additional units to assist on a "search" reflected in the CAD printout at 17:26:58 took place nearly 35 minutes earlier, but also that the dispatcher similarly delayed the report that there were no units available to assist with the search; the dispatcher's response indicating there were no units available was entered into the CAD record at 17:29:13.  See Defense Exhibit B.  Thus, the government's argument is that the dispatcher, for some unknown reason, delayed the entry of two events, and then entered  both events into the CAD system, in tandem, some 40 minutes after the events actually occurred.

II.     THE EVIDENCE AT THE HEARING ESTABLISHED THAT OFFICER HUBBARD PUT THE DOG INSIDE THE CAR BEFORE THE DOG ALERTED.

The government now contends that officer Hubbard's dog, "Jino," alerted while he was outside the car.  Defendants assert officer Hubbard's testimony concerning how Jino alerts is simply not credible.

Apparently, no records the government produces in discovery are reliable.  Like the CAD

*Ter Mkrtichyan: Post-Hearing Reply*           - 8 -

printout, the government asserts its own FBI 302 report[1] is inaccurate. The government now contends that officer Hubbard did not state that "Jino," his drug detecting dog, "alerted by scratching aggressively." See United States Post-Hearing Opposition at 17 fn. 4; see also Defendant's Exhibit BB. Apparently, the government contends that when the FBI agent who wrote the 302 report indicated Hubbard stated "alerted by scratching aggressively," the agent was merely "paraphrasing" what Hubbard said. Defendants assert this statement is not something an FBI agent would create while "paraphrasing" officer Hubbard. The FBI, which unlike the majority of law enforcement agencies refuses to record it's witness interviews, routinely insists that the content of it's 302's are accurate. That oft stated position is obviously inconvenient for the government here, since the content of the 302 clearly impeaches a government witness.

In any event, while officer Hubbard testified at the hearing that "Jino" was trained to "alert" by pulling on his leash, turning his head, breathing, jumping into a car, or any "change in behavior" (see, e.g., RT 5/14 at 45:7-10; RT 6/2 at 65:18; 66:3-15; 84:13-16), the fact remains that none of the training records concerning Jino, nor any of officer Hubbard's prior CHP reports concerning Jino's activities, mention Jino alerting by any means other than a "scratch." See Government's Exhibit 1. In fact, officer Hubbard initially testified that Jino was trained to "alert" by scratching. See RT 5/14 at 20:5-6. Officer Hubbard then changed his testimony to claim there was a difference between Jino's "alert" and "indication," and that Jino "alerted" in many ways. RT 6/2 at 66:22-24; 84:13-16.

In addition, it is simply not credible that the CHP would train their drug detecting dogs to

---

[1] The government asserts its disclosure of the 302 report concerning officer Hubbard's statement was timely because the report was not "drafted" until June 7, 2010. See United States Post-Hearing Opposition at 17 fn. 4. However, officer Hubbard made his statement on May 14, 2010, three weeks prior to his testimony on June 2, yet the government did not disclose the statement until after officer Hubbard testified.

*Ter Mkrtichyan: Post-Hearing Reply*        - 9 -

alert by many different changes in behavior that may be discernable only to the dog's handler. Such training would render it practically impossible for anyone to challenge whether a dog actually alerted, as the "alert" behavior would not be visible to anyone other than the dog's handler.

Even if Jino was trained to "alert" by jumping into the vehicle, which officer Hubbard testified was what happened in this case (see RT 6/2 at 65:12-21; 66:3-5), the search of defendant's vehicle was unlawful. A dog's entry into the interior of a car is a search that requires probable cause. See *New York v. Class*, 475 U.S. 106, 108, 115 (1986); *United States v. Winningham* 140 F.3d 1328, 1330-31 (10th Cir. 1998). Here, the government asserts probable cause for the search of the interior of the car was supplied by the dog executing the very search at issue. Thus, the government maintains the search of defendants' car was lawful because the police did the search. If in fact Jino alerted by searching the interior of the car, probable cause did not exist prior to the search.

## CONCLUSION

The police officers' testimony concerning the length of their detention and questioning of defendants prior to the search of the car is simply not credible. Officer Hubbard's testimony concerning how the drug detection dog "Jino" supposedly alerts by turning his head, changing his breathing, or pulling on a leash is similarly unconvincing and contradicts officer Hubbard's prior statements. The evidence at the hearing clearly shows officer Hubbard stopped the defendants in order to conduct a narcotics investigation, and that is exactly what he did. As a result, the detention and questioning of defendants was far more prolonged than what was

//

//

justified for a routine speeding ticket, and the evidence seized during the search should be suppressed.

Dated: August 13, 2010.　　　　　　　　　Respectfully Submitted,

　　　　　　　　　　　　　　　　　　　　 /s/ Mark Rosenbush

　　　　　　　　　　　　　　　　　　　MARK ROSENBUSH
　　　　　　　　　　　　　　　　　　　Attorney for ARTACHES TER MKRTICHYAN

　　　　　　　　　　　　　　　　　　　ON BEHALF OF ALL DEFENDANTS AND
　　　　　　　　　　　　　　　　　　　THEIR COUNSEL